2026 IL App (2d) 250074-U
No. 2-25-0074
Order filed July 13, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS
SECOND DISTRICT

*In re* COMMITMENT OF ANDREW SAVOY

(Andrew Savoy, Respondent-Appellant v. People of the State of Illinois, Petitioner-Appellee).

Appeal from the Circuit Court of Kane County.
Honorable Bianca Camargo, Judge, Presiding.
No. 12-MR-23

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices McLaren and Birkett concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court properly revoked defendant's conditional release.

¶ 2     Respondent, Andrew Savoy, appeals the revocation of his conditional release under the Sexually Violent Persons Commitment Act (Act) (720 ILCS 207/40(b)(4) (West 2024)). Because respondent violated his release conditions and the trial court properly revoked his conditional release, we affirm.

¶ 3                              I. BACKGROUND

¶ 4                    A. Sexually Violent Person Proceedings

¶ 5     In January 2012, the State filed a petition to commit respondent as a sexually violent person. The petition noted that respondent was adjudicated delinquent for criminal sexual assault in June 2009, was committed to the Department of Juvenile Justice, and was nearing release.

¶ 6    After several continuances, a trial on the State's petition to commit respondent as a sexually violent person was held on September 12, 2022. At that trial, the State's evidence included a certified copy of respondent's juvenile adjudication for the sexually violent offense of criminal sexual assault and testimony from two mental health experts, Dr. Barry Leavitt and Dr. Steven Gaskell.

¶ 7    Dr. Leavitt, who was qualified as an expert in clinical and forensic psychology, as well as "risk assessment of sex offenders and sexually violent persons," testified as follows. Dr. Leavitt was brought in by the Attorney General's Office to conduct a second opinion evaluation of respondent in 2012. Since 2012, Dr. Leavitt had completed five additional evaluations of respondent and opined that respondent consistently met the criteria of a sexually violent person. Dr. Leavitt explained that respondent was adjudicated delinquent for criminal sexual assault in 2005, at age 14, based on his sexual assault of his 9-year-old sister by putting his penis inside her vagina. In addition, respondent admitted to incidents of sexual abuse of his sister the preceding four to five years. Respondent also admitted to sexually abusing his brother during a period of about five years.

¶ 8    According to Dr. Leavitt, the juvenile court ordered respondent to participate in residential sex offender treatment at a facility in Wisconsin, but respondent was discharged from that facility "unsatisfactorily" after three years, due to sexually abusing four other children. Afterwards, respondent was transferred to an Illinois Youth Center facility. There, at age 20, respondent was released on parole to another residential treatment facility in Indian Oaks, where he received boundary violation citations after he touched people inappropriately. In particular, Dr. Leavitt was concerned about respondent's "more violent and sadistic types of fantasies" involving his sister

and his mother. Respondent's lack of progress led to a parole violation and his return to the Illinois Youth Center facility for additional juvenile sex offender treatment.

¶ 9 Respondent was then transferred to a detention facility with the Illinois Department of Human Services (DHS), where he has now been for the past 10 years. At that facility, respondent participated in the five-phase sex offender treatment program but was stuck in the second phase, which is the "accepting responsibility phase" of treatment. Later, in 2018 or 2019, respondent was removed from the core sex offender treatment program and disclosure group due to depression and a lack of engagement. Respondent was then placed in the "Power to Change" group, where he was "doing better" until May 2022.

¶ 10 Dr. Leavitt diagnosed respondent with mental disorders under the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. Specifically, Dr. Leavitt diagnosed respondent with "other specified paraphilic disorder" based on his sexual attraction to nonconsenting persons, autism spectrum disorder, and "other specified depressive disorder in partial remission." Respondent admitted having several victims in the context of his sex offender treatment, including his biological sister and his biological brother. Despite an extensive period of juvenile treatment opportunities from the age of 14 to 21, Dr. Leavitt stated that there was a "consistent history of treatment failure." Dr. Leavitt further opined that "many factors" created a substantial probability of respondent's "continuing to sexually reoffend at some time in the future." Respondent, now 31 years old, had not successfully completed any course of juvenile or adult treatment.

¶ 11 Dr. Gaskell testified next as follows. Dr. Gaskell diagnosed respondent with sexual sadism disorder, frotteuristic disorder, and other specified personality disorder with antisocial and borderline traits. All three disorders qualified as a mental disorder under the Act. Dr. Gaskell identified the following factors as increasing respondent's risk of reoffense: his relatively young

age; the fact that he had never been married; sexual acts against a male victim; sexual preoccupation; early onset of sexual offending; deviant sexual interests, including a sexual interest in children; tolerance of sexual crimes; a negative relationship with his mother; separation from his parents; neglect and physical or emotional abuse; childhood criminality; a personality disorder; hostility; general self-regulation problems, such as impulsivity and recklessness; intimate relationship conflicts; and, a failure to complete sex offender treatment. Like Dr. Leavitt, Dr. Gaskell opined that respondent's mental disorders made it substantially probable that respondent would commit future acts of sexual violence.

¶ 12 In sum, both doctors opined that respondent met the criteria of a sexually violent person.

¶ 13 The last witness was Dr. Deborah Nicolai, who testified on behalf of respondent. Dr. Nicolai testified that respondent was not a sexually violent person, because he did not have a qualifying mental disorder; he was at a low risk of reoffense; and, he was making progress in treatment.

¶ 14 Based on the above evidence, the trial court determined that respondent was a sexually violent person.

¶ 15 B. Conditional Release Proceedings

¶ 16 At a subsequent dispositional hearing on April 5, 2023, the trial court received a report from Dr. Nicole Hernandez, who evaluated respondent and opined that the least restrictive environment where he could be effectively and safely treated was the DHS conditional release program. At that hearing, respondent confirmed that he had read the conditional release plan, initialed every paragraph of it, fully understood all of the conditions, was willing to abide by them if released, and had no questions. The trial court approved the conditional release plan. Respondent was then released to the custody of DHS.

¶ 17     On December 20, 2024, the State petitioned to revoke respondent's conditional release due to the violation of three release conditions. Specifically, the State's petition alleged that respondent violated the following conditions: condition 6, in that respondent withheld information about his sexual fantasies and masturbation during therapy; condition 27, in that respondent failed to provide logs of his activities and monthly written reports as directed by his management team; and, condition 32, in that respondent was not truthful to his agent or therapist on multiple specified occasions. The State also alleged in its petition that revoking conditional release was required to protect others in the community.

¶ 18     On January 17, 2025, the trial court conducted a hearing on the State's petition to revoke conditional release. Morgan Franden testified first as follows. Franden was employed by the Specialized Forensic Unit with Liberty Health, which monitors individuals on conditional release under the Act. Franden was licensed as a Clinical Professional Counselor and a Sex Offender Treatment provider and served as respondent's psychosexual therapist beginning in January 2024. Franden provided individual and group therapy to respondent once a week and also met with respondent's case management team twice per month.

¶ 19     Franden explained that "[s]exual functioning logs" provided a way to monitor respondent's sexual functioning. On January 11, 2024, the case management team decided to issue a "[l]etter of [u]nderstanding" against respondent, based on him lying to his conditional release agent at Liberty Health, Elsa Sandoval. Franden explained that the letter of understanding is "a written kind of warning" that a rule has been violated. Then, on February 15, 2024, and on March 3, 2024, "[l]etter(s) of [a]dmonishment" were issued to respondent, again based on lying to Sandoval. According to Franden, lying was "absolutely significant" in terms of an individual's ability to be successful on conditional release.

¶ 20    Respondent took a polygraph test on May 7, 2024. Respondent's statements to the polygraph examiner regarding masturbation were inconsistent with his statements to agent Sandoval on April 25, 2024, and on May 5, 2024, which "was a big concern" as to why was he "lying." Respondent's lying about sexual functioning was a "huge risk factor" regarding deviant sexual arousal. Later, on May 20, 2024, respondent was issued another letter of admonishment based on his inconsistent statements, which violated condition 6 of his conditional release plan "about being transparent and engaged in treatment."

¶ 21    A penile plethysmograph (PPG) test was administered to respondent on May 14, 2024, as part of his conditional release plan. Franden reported that there were "concerns" about the exam taking "at least twice as long" as normal, as well as respondent's behavioral presentation, in that he acted "grandiose, histrionic, joking," and immature. Because respondent's conduct during this PPG test amounted to a violation of his conditional release plan, respondent was issued another letter of admonishment on June 30, 2024. In addition, based on his lack of transparency, Franden drafted a behavioral contract for respondent, which was a "a more formal kind of written paper for clients who are struggling with certain" sexual functioning authenticity and behaviors. When Franden went over the behavioral contract with respondent, he claimed to understand what was expected of him and signed it.

¶ 22    In July 2024, respondent asked for his grandfather to be a "support person," although he failed to disclose that "one of his victims lived with his grandfather prior to asking for him to become a support person." At a case management meeting on July 25, 2024, agent Sandoval advised Franden that respondent claimed to have told Franden during a therapy session about the victim living with his grandfather, but Franden denied that respondent revealed this information to her. As a result, another letter of admonishment for lying was issued on July 30, 2024.

¶ 23    In addition, on July 31, 2024, a letter of admonishment was issued to respondent for "lying about calling Com Ed."

¶ 24    Defendant took a polygraph test on December 5, 2024. After the test, Franden advised respondent that she was "really concerned, again," due to him being "inauthentic with" her about his masturbation level in a 24-hour period. Respondent told Franden "no" regarding masturbation and then "got to the polygraph and made disclosures," which was a pattern of behavior. According to Franden, respondent demonstrated "poor accountability, poor planning, and not being on top of controlling his behavior," when he had "all these risk factors that connect to risk of sexual re-offense." Respondent also told Franden that his meeting with his psychiatrist went "splendid," based on respondent's claim that he told his psychiatrist of his sexual preoccupation. However, Franden later learned from agent Sandoval that respondent "didn't say" anything about his sexual preoccupation "in his meeting." In addition, in November and December of 2024, respondent was not experiencing a decrease in his fantasies of "voyeuristic" and "fetish" acts, which Franden found to be "big flags" and "big treatment indicators" that respondent was "struggling."

¶ 25    Based on her education, training, experience and treatment of respondent, Franden did not believe that respondent could consistently comply with the current conditions of his conditional release. Accordingly, Franden opined that inpatient therapy was more appropriate for respondent. Franden's concern was that after one year of therapy with respondent, he was "not able to intervene on his risk factors at this point independently." Respondent suffered from impulsivity, sexual deviant arousal, and poor self-regulation, which affected "his ability to recognize a risk and intervene if he were to become emotionally dysregulated."

¶ 26    Conditional release agent Elsa Sandoval testified last as follows. Sandoval, as an assigned agent, began supervising respondent in January 2024. Although respondent's conditional release

began in April 2023, respondent voluntarily returned to the detention facility in June 2023 due to "suicidal ideations." Respondent was then "re-released" in January 2024. During Sandoval's supervision of respondent from January 2024 to December 2024, she issued letters of admonishment to him due to "infractions." When Sandoval reviewed the conditional release plan with respondent, he initialed the conditions and dated them.

¶ 27    On December 19, 2024, Sandoval issued a letter of admonishment to respondent based on his failure to disclose information to his therapist Franden and to his psychiatrist about his sexual functioning. According to Sandoval, respondent failed to maintain sexuality logs and provided "conflicting information" during his polygraph examination, which was a violation of condition 6 of respondent's conditional release plan, requiring full participation in treatment. In addition, Sandoval was present for respondent's session with Dr. Tinwalla, a psychiatrist, on December 18, 2024, in which respondent failed to mention that he was "sexually preoccupied." Sandoval also noted that respondent had violated condition 27 of his conditional release plan by failing to show up to his individual therapy session with his sexual logs, which he had not completed for seven days. Further, condition 32 of respondent's conditional release plan required respondent to be truthful with his agent and case management. However, Sandoval listed condition 32 as a condition that respondent had violated based on "the conflicting stories" that he was telling therapist Franden and the psychiatrist.

¶ 28    Without objection, the State entered several exhibits, which consisted of respondent's conditional release plan and Sandoval's letters of admonishment. A second letter of admonishment, issued on January 11, 2024, was based on an incident in which respondent had been dropped off by a transporter at his apartment after treatment. Sandoval explained that respondent did not have a key to the front foyer of his apartment complex and was instructed to walk around to the back

and then advise when he was inside the apartment. Although respondent claimed to be inside the apartment, he was not inside, but rather on the back porch. About 45 minutes later, Sandoval received another call from respondent that he had "just gotten inside the apartment." Sandoval testified that she was "confused" over the call. Respondent told Sandoval that his landlord had to let him in, because the door was not on the hinges. However, Sandoval called the landlord and learned that respondent had used the security latch and the chain and had locked himself out. When Sandoval asked respondent what he had been doing for the past 45 minutes, he said he had been sitting on the porch, waiting to get inside the apartment. Sandoval issued a letter of admonishment because respondent never told her that he was locked out of his apartment, and because respondent was not authorized to call anyone other than Sandoval.

¶ 29 Sandoval issued a third letter of admonishment to respondent on February 15, 2024, concerning his "GPS device." After Sandoval "received an alert from the monitoring company that there was a park rule violation," she called respondent to "find out what was going on." Respondent "said nothing, that he was in the apartment," and he denied that his GPS device was "going off." Because the monitoring software indicated that respondent was "at home," Sandoval "just let it go." However, three hours later, respondent called back to see if Sandoval had figured it out, because his GPS device was going off. Although respondent initially claimed that the GPS device had been going off for only 10 minutes, he later admitted that it "had been going off since that initial call was placed approximately three hours prior to that."

¶ 30 Sandoval then issued a fourth letter of admonishment to respondent on March 3, 2024, after she conducted an unannounced home visit. When Sandoval knocked on the door, respondent asked her to give him a minute before opening the door. At first, respondent said that he had been in the bathroom, which was only a few feet away. However, respondent then stated that he had been in

the bedroom. Respondent's conflicting stories of where he was at in the apartment concerned Sandoval.

¶ 31 Sandavol issued a fifth letter of admonishment on May 20, 2024, based on respondent's polygraph examination. Respondent had disclosed information to the polygraph examiner, but not to therapist Franden, regarding his sexual functioning, including "a rape fantasy." Sandoval then issued a sixth letter of admonishment on June 4, 2024, based on respondent's "PPG." In particular, respondent appeared "superficially cooperative" and "somewhat dramatic" based on the exam taking twice as long due to "exaggerated behaviors."

¶ 32 Sandoval then issued a seventh letter of admonishment on June 30, 2024. This violation was based on respondent's claim to Sandoval that his medication increased his sexual arousal, despite his statement to therapist Franden to "the opposite, that the medication decreased his sexual arousal." Respondent was attempting to deflect the results of the PPG and later admitted lying to Sandoval regarding the side effects of his medication.

¶ 33 Sandoval also issued an eighth letter of admonishment to respondent on July 30, 2024, based on his proposal of his grandfather as a support person. Although respondent claimed that he had told therapist Franden that his grandfather lived with his brother, who was his previous victim, respondent had "not mentioned that to his therapist." The next day, July 31, 2024, Sandoval issued a ninth letter of admonishment to respondent based on Com Ed bills "going to his apartment" rather than "the Springfield address." Although respondent claimed to have talked to Com Ed representatives and taken care of the billing issue, the call logs revealed that "he had not been calling" Com Ed, given that his calls lasted only "a few seconds."

¶ 34                    C. Conditional Release Revocation

¶ 35    The trial court issued its ruling on the State's petition to revoke respondent's conditional release on February 21, 2025. The court ruled as follows. The relevant time period for the State's petition was January 4, 2024, to December 2024. During this period of less than one year, respondent was issued "a letter of understanding, seven letters of admonishment, one violation report, and a behavioral contract." The court found that respondent violated the three release conditions alleged in the State's petition.

¶ 36    The first release condition that respondent violated was condition 6, which required respondent to attend and fully participate in assessment, treatment, and behavior monitoring. Respondent violated this condition by failing to disclose information to therapist Franden, despite her direct questions, including a "violent rape fantasy with his minor sister and her friend," after making such statements to the polygraph administrator. Respondent received a letter of admonishment for this inconsistent statement. Respondent also received a letter of admonishment for "joking around" and acting immature during the PPG test, causing it to take twice as long, and by being "superficially cooperative and somewhat dramatic." Further, respondent admitted lying to Sandoval about the side effects of his medication, which was done in an effort to "deflect the results from the PPG test."

¶ 37    Likewise, respondent violated condition 27, which required respondent to provide a written log of activities and monthly written reports as directed by the case management team. Despite this requirement, respondent was issued a violation report for failing to complete his sexual logs for seven days. The court noted that the testimony showed that the logs were important to monitor respondent's "current sexual functioning," given the "concern" that respondent suffered from "deviant sexual arousal."

¶ 38     In addition, although condition 32 of the conditional release plan required respondent to be truthful to agents and case management at all times, respondent demonstrated "several incidents" that were inconsistent, including failing to disclose the fact that one of his victims was living with his grandfather, the very support person respondent was trying to onboard. Also, respondent claimed to have spoken twice to a Com Ed representative to resolve the mailing issue, when the call logs proved otherwise. Likewise, respondent was not truthful about being locked out of his apartment or about the GPS device. Specifically, when the agent contacted respondent about the GPS device being activated, respondent denied that it was going off and claimed that there "were no issues with the (GPS) monitor." However, respondent called the agent back three hours later and stated that the device had "started ten minutes before" his call, "but then later admitted that it had been going off since the initial phone call with the agent." In addition, during an unannounced home visit, respondent asked the agent to give him "a minute," and then claimed to have been in the bathroom. Yet, "when pressed," defendant admitted that "he was actually in the bedroom," and he had "no response as to why he lied to his agent."

¶ 39     The court reasoned that although some of respondent's violations may seem "petty," defendant's behavior had to be redirected ten times in less than a year. Both of the State's witnesses testified about the concerns they had about respondent's ability to follow the release conditions. According to the court, respondent's behavior did not change, and his "little/big lies all screamed deception and concern." Respondent could not be "honest with the people designed to help" him. As a result, the court concluded that the State had proven by clear and convincing evidence that respondent had violated the rules of his conditional release.

¶ 40 Conversely, however, the court also found that the State had not proven by clear and convincing evidence "the safety of others portion" of its petition to revoke respondent's conditional release.

¶ 41 The court explained that the next step was to determine whether respondent's violations of his conditional release were sufficient to revoke it and, in doing so, the court relied on *In re Commitment of Tunget*, 2018 IL App (1st) 162555. According to the court, "the violations committed" by respondent were "significant when looked at as a whole." There was "no reason for the pattern of deception" other than respondent's "unwillingness to make progress with the treatment team" and his intent to "deceive the team." The court highlighted Franden's testimony that respondent needed a lot of "redirection," suffered from "impulsivity, sexually deviant arousal, [and] poor sexual regulation," which caused Franden to "worry" about respondent's "ability to recognize a risk and intervene if he were to become sexually dysregulated." Finally, the court stated that although respondent "had an entire team dedicated to him to ensure that he was successful in his conditional release," the need to "implement a behavior contract" to "redirect and refocus" respondent still failed to result in respondent's compliance. In sum, respondent's failure to report sexual functioning and his withholding of information from the treatment team led the court to grant the State's petition to revoke conditional release.

¶ 42 Respondent timely appealed.

¶ 43                                    II. ANALYSIS

¶ 44 On appeal, respondent argues that the trial court erred in "recommitting" respondent "as a sexually violent person where the State failed to prove by clear and convincing evidence that he suffered from a mental disorder that made it substantially probable that he would engage in acts of sexual violence." Respondent argues that his "disclosure inconsistencies—though concerning—

- 13 -

do not establish a substantial probability of violent conduct," and that the trial court "credited speculative risk assessments over the absence of any sexual misconduct, violent ideation, or behavioral regressions." In making this argument, respondent relies primarily on *In re Commitment of Rendon*, 2018 IL App (1st) 171873.

¶ 45    The State initially counters that respondent's argument is forfeited. According to the State, none of respondent's "points are supported with citations to relevant authorities," respondent failed to distinguish the case relied on by the trial court, namely *Tunget*, 2018 IL App (1st) 162555, and the case principally relied on by respondent is incorrectly cited, in that the correct citation is *In re Commitment of Rendon*, 2014 IL App (1st) 123090. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (our supreme court rules provide that contentions in appellate briefs must be supported by citations to the record, reasoned analysis, and that contentions not so developed are forfeited). In a similar vein, the State avers that respondent "incorrectly argues" that the revocation of respondent's conditional release was a "recommitment" that required the State to prove that it was substantially probable he would commit sexually violent acts. The State points out that the Act did not require it to prove that respondent was a sexually violent person "again" at the revocation hearing; rather, the State needed only to prove that any rule or condition of release was violated, or that the safety of others required revocation of the conditional release.

¶ 46    In his reply brief, respondent concedes his incorrect case citation but maintains that his argument challenging the revocation of his conditional release should not be forfeited. We appreciate the State's argument regarding forfeiture and agree that respondent's initial brief contains minimal argument, an incorrect case citation, and a misunderstanding of the State's burden in a conditional release revocation hearing. Although there is merit to the State's forfeiture argument, given the nature of the case, we address the merits of respondent's argument on appeal.

See *In re Janet S.*, 305 Ill. App. 3d 318, 320 (1999) (waiver is limitation on the parties, not on the court).

¶ 47   As the State points out, the Act provides that once a person is adjudicated a sexually violent person, the trial court "shall order the person to be committed to the Department for control, care and treatment until such time as the person is no longer a sexually violent person." 725 ILCS 207/40(a). The court's commitment order "shall specify either institutional care in a secure facility" or "conditional release." *Id.* § 40 (b)(2). If the person is conditionally released, they remain within the custody and control of DHS, and subject to conditions set by statute, the court, and DHS, including full participation in assessment, treatment and behavior monitoring, among other conditions. *Id.* § 40(b)(4), (b)(5). The State may petition to revoke that release, either on its own initiative, or, as in the instant case, at the request of DHS. *Id.* § 40 (b)(4). Once the State petitions to revoke a person's conditional release, it has "the burden of proving by clear and convincing evidence that any rule or condition of release has been violated, *or* that the safety of others requires that the conditional release be revoked. (Emphasis added.) *Id.*; see also *Tunget*, 2018 IL App (1st) 162555, ¶ 39 (once the State proves that the sexually violent person violated release conditions, the State is not also required to prove that the "safety of others" requires revocation of conditional release, given that the Act's plain language makes these separate and independent grounds for revocation). If the court finds that the State has proven either ground for revocation, "it may revoke the order for conditional release and order that the released person be placed in an appropriate institution until the person is discharged from the commitment" or "until again placed on conditional release." 725 ILCS 207/40(b)(4) (West 2024).

¶ 48   In the present case, the State's petition alleged both grounds for revocation of conditional release, in that respondent violated his release conditions and posed a threat to the safety of others.

In its ruling, the trial court determined that the State had proven by clear and convincing evidence that respondent violated his release conditions, but had not proven by clear and convincing evidence that respondent posed a threat to the safety of others. Accordingly, that ruling is the subject of our review.

¶ 49    As the court explained in *Tunget*, 2018 IL App (1st) 162555, ¶ 35, "our review of whether the trial court erred in finding respondent violated the conditions of his release and whether his conditional release should be revoked as a result requires a two-step analysis." First, the trial court's factual finding that the State presented clear and convincing evidence to establish that the respondent violated the conditions of his release will not be disturbed unless the finding was against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the finding itself is unreasonable, arbitrary, or not based upon the evidence presented." *In re Commitment of Trulock*, 2012 IL App (3d) 110550, ¶ 43. Second, once a basis for revocation of conditional release has been established, whether to commit a person to a secure facility or to continue conditional release is within the discretion of the trial court. *Tunget*, 2018 IL App (1st) 162555, ¶ 35. Regarding this second step, as stated above, the Act provides that if the court determines that any rule or condition of release has been violated, it "may" revoke the order for conditional release and order that the released person be placed in an appropriate institution. 725 ILCS 207/40(b)(4) (West 2024). The permissive term "may" employed in the statute refers to a discretionary power, which the court may exercise or not as it chooses. *Tunget*, 2018 IL App (1st) 162555, ¶ 35. "A trial court's decision following an exercise of its discretion will not be overturned absent an abuse of that discretion." *Id.* See also *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 608-09 (2007) (applying an abuse of discretion analysis to assess

- 16 -

a trial court's decision to commit the respondent to a secure facility). An abuse of discretion will be found only if the trial court's decision was unreasonable, arbitrary, or no reasonable person would adopt the same view. *Tunget*, 2018 IL App (1st) 162555, ¶ 35.

¶ 50    Beginning with the first step of our analysis, the trial court's determination that respondent violated his release conditions was not against the manifest weight of the evidence. In making its ruling, the trial court relied on the State's exhibits entered into evidence as well as the testimony of therapist Franden and agent Sandoval. Specifically, the trial court found that during the relevant time period for the State's petition, which was the year 2024, respondent was issued one letter of understanding, seven letters of admonishment, a violation report, and a behavioral contract. Our review of the record and Sandoval's testimony shows that respondent was actually issued nine letters of admonishment during 2024. Regardless, we agree with the trial court that based on the above evidence, respondent violated three release conditions.

¶ 51    First, condition 6 required respondent to fully participate in assessment, treatment, and behavioral monitoring. Respondent violated condition 6 by failing to disclose information to his therapist Franden, despite her direct questions. In particular, respondent received a letter of admonishment for an inconsistent statement he made to his polygraph examiner, which consisted of a violent rape fantasy involving his sister, who was a previous victim, and her friend, because he never made such a statement to Franden. In addition, respondent violated condition 6 by acting inappropriately, being superficially cooperative and dramatic, during the PPG test, causing it to take twice as long. Defendant also violated condition 6 by lying to Sandoval about the side effects of his medication in order to deflect the results of his PPG test.

¶ 52    Second, respondent violated rule 27, which required him to provide a written log of activities and monthly written reports, as directed by the case management team. Respondent was

issued a violation report for failing to complete his sexual logs for seven days. The court took particular note of the witnesses' testimony that the logs were important to monitor respondent's "current sexual functioning," given the "concern" that respondent had "deviant sexual arousal."

¶ 53    Third, respondent violated rule 32, which required respondent to be truthful to agents and case management at all times, based on several inconsistent statements and/or omissions. These included: (1) failing to disclose the fact that one of his victims, namely his brother, was living with his grandfather, who was the person respondent was trying to onboard as a support person; (2) claiming that he had spoken to Com Ed representatives to resolve the mailing issue, when the call logs proved otherwise; (3) failing to be truthful about being locked out of his apartment; and (4) failing to disclose that there was an issue regarding his GPS device. The court noted that when agent Sandoval contacted respondent about his GPS device being activated, respondent denied that it was going off and claimed that there were no issues. However, respondent then called agent Sandoval three hours later and stated that his GPS device had being going off for ten minutes. After that, respondent finally admitted that his GPS device had been going off since the initial phone call with agent Sandoval. In addition, during an unannounced home visit, respondent asked agent Sandoval to give him "a minute," and then claimed to have been in the bathroom. However, "when pressed," defendant admitted that "he was actually in the bedroom," and he had "no response as to why he lied to his agent."

¶ 54    In his reply brief, respondent attempts to diminish the trial court's findings by characterizing the above incidents as falling into categories of "self-correction," a "common autistic communication trait," or "cooperation, not dishonesty." However, it was up to the trial court to weigh the evidence and assess the credibility of the witnesses. See *Trulock*, 2012 IL App (3d) 110550, ¶ 43 (under the manifest-weight standard, deference is given to the trial court as the

finder of fact, because the trial court is in a better position than the reviewing court to observe the conduct and demeanor of the witnesses). Further, the court made clear in its ruling that although some of respondent's violations may seem "petty," both Franden and Sandoval expressed concerns regarding respondent's ability to follow the release conditions. According to the court, respondent's behavior did not change, and his "little/big lies" screamed deception and concern. Overall, respondent could not be "honest with the people designed to help" him. For these reasons, the trial court's determination that the State provided clear and convincing evidence of respondent's violations of his release conditions was not against the manifest weight of the evidence.

¶ 55    Turning to the second and final step of our analysis, the trial court did not abuse its discretion by determining that respondent's violations were sufficient to revoke his conditional release. In this regard, the court specifically found that the violations committed by respondent were significant when looked at as a whole. The court found respondent's overall pattern of deception demonstrated his unwillingness to make progress with his treatment team.

¶ 56    In arriving at this conclusion, the court took particular note of Franden's testimony that respondent needed a lot of redirection. At the revocation hearing, Franden testified that respondent suffered from impulsivity, sexually deviant arousal, and poor sexual regulation, which caused her concern regarding respondent's response if he were to become sexually dysregulated. Specifically, Franden was concerned about respondent's ability to recognize and intervene in such a situation. Based on her education, training, experience, and treatment of respondent, Franden did not believe that he could consistently comply with the current conditions of his conditional release. For this reason, Franden opined that inpatient treatment was more appropriate for respondent.

¶ 57    Despite an entire team dedicated to respondent's conditional release, the court noted that there was still the need to issue multiple letters of admonishment and implement a behavioral contract to redirect him. Significantly, the behavioral contract did not result in respondent's compliance, even though respondent claimed to understand what was expected of him.

¶ 58    In addition, the court noted that some of the condition violations stemmed from respondent's failure to report sexual functioning, which was a means of tracking respondent's progress towards healthy sexual functioning. In sum, respondent's inability to comply with release conditions, as well as his withholding of information from the treatment team, led the trial court to revoke his conditional release. Based on the above evidence, the trial court did not abuse its discretion in reaching this determination.

¶ 59                                III. CONCLUSION

¶ 60    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 61    Affirmed.